Raleigh v. Fitzpatrick.

---

WALTER RALEIGH

*v.*

JAMES G. FITZPATRICK et al.

1. Defendants were the president, vice-president and treasurer of a corporation, for the development and sale of a tract of land, which had assumed the payment of a mortgage thereon. Differences arose between them and complainant, who was the secretary and sales agent of the company, which, defendants allege, stopped the sale of the lots. The interest on the mortgage was not paid, and it was foreclosed, and defendants bought the premises at the foreclosure sale for about the amount due the mortgagees thereon.—*Held*, that they

could not hold the title for their own benefit, but only as trustees for complainant and the other corporators; and that a preliminary injunction restraining them from disposing of or encumbering the lands should be continued.

2. That the attitude of the parties required the court to appoint a stranger the receiver of the property *pendente lite.*

*Mr. Herbert A. Drake* and *Mr. Theodore Runyon,* for complainant.

*Mr. Leon Abbett,* for defendants.

BIRD, V. C.

Shall the preliminary injunction, issued in this case, be dissolved on this motion, is the question presented for the consideration of the court.

Nothing short of a clear and concise statement of all the facts, out of which this litigation arose, can satisfy the mind that the conclusion reached is the correct one, whether the motion be granted or not. It should be noted that the facts disclose a portion of a family history, and an effort made by the members thereof to preserve all of the inheritance left to them by their ancestor as nearly intact as possible, and to make a profit out of that which they found themselves obliged to dispose of for the sake of the preservation of the rest.

Maurice Raleigh, of the city of Philadelphia, being possessed of large real and personal estate in the city of Philadelphia, and of about thirty thousand acres of land, in the counties of Cumberland, Burlington and Atlantic, in New Jersey, departed this life in the year 1882, having first published his last will and testament, giving directions for the disposition of his estate and appointing executors. The agreements which the heirs-at-law, legatees and devisees, and the executors, entered into, as hereafter recited, show the necessity for such agreements, and the earnest desire upon the part of all interested to effect the purpose therein expressed.

On October 1st, 1884, James Raleigh, Walter Raleigh, Mary Raleigh Fitzpatrick, Martha F. Raleigh, Kings Raleigh and

Catherine R. Raleigh, being the children of the said testator, of the first part, and James G. Fitzpatrick, the husband of the said Mary, of the second part, entered into an agreement, in which they recited that they were interested in the said real estate in New Jersey, and that they had determined, for the purpose of closing up and disposing of it, that it should be sold for the sum of $150,000; and that the said devisees thereby authorized the said James G. Fitzpatrick to sell the same, or to procure it to be sold, to a company to be formed under the laws of the state of New York, the capital stock of which should be $600,000, and that he should accept from said company four thousand shares as payment of the sum of $100,000 in cash, which said four thousand shares they thereby covenanted and agreed that the said party of the second part should deposit with the treasurer of said company as security for the payment of a mortgage executed as a lien upon said premises for the sum of $100,000, in favor of the executors of the will of said Maurice Raleigh, deceased; and they thereby nominated the said Fitzpatrick as their true and lawful attorney, and vested in him sole and exclusive power to vote upon said stock in their names. And they agreed, also, to execute and deliver to the said Fitzpatrick, on demand, from time to time, as he might require the same, good and sufficient proxies for the purpose of enabling him more effectually to vote upon the said four thousand shares of stock; and they further authorized the said Fitzpatrick to deliver to one Richard S. Newcombe, a lawyer, of the city of New York, for services rendered by him in connection with the said four thousand shares, stock equal to the value of $6,000 in cash.

On the same day, in October, another paper-writing was made and signed, by which the said James G. Fitzpatrick and Walter Raleigh, as trustees, of the one part, and B. Loebenthal and James W. Dell, executors of Maurice Raleigh, of the other part, agreed with the executors, with the consent of the widow, devisees and heirs of Maurice Raleigh, deceased, and upon their executing a proper release, releasing the said executors from all liability to account for the sale of the said lands, to sell to the said Fitzpatrick and Walter Raleigh, as trustees, the said lands in New Jer-

sey, for the sum of $150,000, and to deliver deeds therefor on or before the 31st day of December then next ensuing; $50,000 of the said purchase-money was to be paid in cash, and $100,000 secured by bond and mortgage upon said property, payable in five years, and without interest until December 31st, 1885, and interest thereafter, at the rate of four per cent., payable half-yearly; but said mortgage was to contain a clause providing for the release of such portion or portions of said property as might be sold, upon the payment of two-thirds of the purchase-money, on account of said mortgage—restraining, however, the sale of any of the said lands for less than $5 per acre—with the usual proviso, that upon failure of the payment of the interest within thirty days after any half-yearly payment should have become due, the whole principal and all interest should become due and payable.

Upon the same day, the said trustees, as such, and all of the said heirs and devisees, together with the widow of Maurice Raleigh, made and executed another writing, which witnessed that the said trustees, heirs and devisees, agreed to execute and deliver to the said company so to be formed, on or before the 31st day of December, 1884, a good and sufficient deed of all the real and personal property belonging to the said estate of Maurice Raleigh, subject to a mortgage of $100,000, payable as already expressed, being the same mortgage above referred to; and that the said company so about to be formed agreed to pay therefor the sum of $600,000, delivering four thousand shares of said stock, of the par value of $100 per share, which said four thousand shares were to be deposited with Moritz Cohn, as treasurer of the said company, then about to be formed, and held by him in trust as security for the payment, by the said trustees, of the said mortgage of $100,000.

On the same day, the said heirs and devisees stipulated, in a separate writing, that the said James G. Fitzpatrick should pay to the said Richard S. Newcombe $1,000 out of each of their respective shares of said stock, in all $6,000, as compensation for the services rendered by him, in perfecting the said arrangements or negotiations.

Raleigh v. Fitzpatrick.

In furtherance of the main design, and upon the same day, the said heirs and devisees entered into an agreement, in writing, with the said James G. Fitzpatrick, in which it was recited, that,

"Whereas, the said parties of the first part were entitled to real estate in Pennsylvania and New Jersey, under the will of the said Maurice Raleigh, and it had been agreed between them that their respective interests rendered it desirable that none of the property, except the property in the state of New Jersey, should be sold, which it had been agreed should be vested in the company to be formed for the purpose of holding said property and disposing of it as the company might deem best,"

they thereupon covenanted and agreed that they, the said heirs and devisees, would not, nor would either of them, sell or in any way dispose of or encumber their or any of their rights or interests in said property, and that they thereby transferred and conveyed to the said James G. Fitzpatrick all their right, title and interest in and to the same, both in the state of Pennsylvania and in the state of New Jersey, in trust, that out of the income of the property in Pennsylvania he would pay all sums necessary for keeping the said property in repair; that he would pay all taxes and assessments levied upon the same, and all insurance premiums necessary, and the interest upon all mortgage liens, and that the balance he would pay to the said heirs and devisees. They also transferred to the said James G. Fitzpatrick all the income of the property in New Jersey, in trust, that he should apply the same towards the payment of the mortgages then existing upon the property in Pennsylvania, and any surplus which might remain, to invest the same upon bond and mortgage.

This power of attorney and declaration of trust, all of them, but Mrs. Mary R. Fitzpatrick, undertook, by writing, to revoke, of the 10th day of August, 1885; and on the 8th day of October, 1884, the said James G. Fitzpatrick and Mary R., his wife, executed a writing in and by which they undertook to revoke the trust contained in the last aforesaid agreement, bearing date October 1st, 1884.

In view of these agreements, and by virtue of the power of attorney, a company, called "The Raleigh Land and Improvement Company," was organized under the laws of the state

of New York, by the said James G. Fitzpatrick, Richard S. Newcombe, Moritz Cohn, Jeremiah Fitzgerald, John T. Farley and Albert Cardoza, whose certificate bears date the 10th day of December, 1884. And it was incorporated for the purpose of carrying on the business of purchasing and improving real estate for residences, homestead and apartment houses, to be leased and conducted by the said company, and occupied by the stockholders thereof, with a capital stock of $600,000 (just the amount contemplated in all the above-named agreements), to consist of six thousand shares, of $100 each; which certificate was filed and recorded according to law. About the 10th of February, 1885, the said executors conveyed all the said land in the state of New Jersey to the said Walter Raleigh and the said James G. Fitzpatrick, trustees for the devisees of Maurice Raleigh, deceased, the consideration therein named being $150,000; and, about the same time, the said trustees made a mortgage on the same premises to the said executors, to secure the bond of the said trustees of the same date, for the payment of $100,000, in the manner above stipulated; and upon the same day the said trustees executed and delivered a conveyance of the said property so mortgaged to the said corporation called "The Raleigh Land and Improvement Company," the consideration mentioned therein being $600,000. At the time of this transaction there was a mortgage encumbrance of $50,000 upon the premises. Of the consideration given to the executors, $50,000 was paid in cash, to be used in discharging the mortgage, which then and before was a lien upon the premises. This $50,000 was paid by the following named persons: $2,500 by Walter Raleigh, $5,000 by William Arnott, $24,000 by the said James G. Fitzpatrick, $5,000 by Richard S. Newcombe, $10,000 by Moritz Cohn, $500 by Jeremiah Fitzpatrick, and $2,000 by John T. Farley.

The principal, if not the only object of the formation of this company, undoubtedly, was the improvement and sale of these lands in New Jersey. It is undoubtedly true that James G. Fitzpatrick had the entire confidence of all the Raleigh heirs and devisees. At the commencement of this enterprise, they

trusted him implicitly; he was elected president of the said company. The said Newcombe, who had had $6,000 for his services previously rendered, was made vice-president; Moritz Cohn, treasurer; and the said Fitzpatrick, Cohn and Newcombe were appointed a standing executive committee; the said Walter Raleigh was secretary, and he was appointed the agent of the company to superintend and make sale of portions of the premises, and resided thereon without charge of rent, and had a salary of $1,200 a year. According to the provisions of the agreements above recited, the title to said thirty thousand acres was conveyed; and the mortgage for $100,000 was given.

After the said 10th day of February, 1885, $600,000 worth of stock was issued to the said Walter Raleigh and the said Fitzpatrick, trustees as aforesaid, and at the same time the said Walter Raleigh was requested to join with the said James G. Fitzpatrick in making a transfer of all the said stock back to the treasurer of the said company, Moritz Cohn, without any consideration, on the promise that two-thirds thereof would be signed back to the said Walter Raleigh and the said Fitzpatrick, as and for the $400,000 to be paid in stock to the devisees of the said Maurice Raleigh, deceased; Walter Raleigh refused to join in this transfer, alleging that counsel advised him so to refuse. But, notwithstanding such refusal, the company proceeded to act and to carry on the work of land improvement and sale according to said agreements.

What has already been intimated, might with propriety be here again repeated—that evidently this was a family arrangement, in and by which, trusting and confiding in each other, they mutually bound themselves each to the other, and hoped and attempted to better their pecuniary condition by the formation of this company.

Lands were sold in parcels by the said company, the executors releasing the lands so sold upon the receipt of two-thirds of the purchase-money, according to the conditions of the original agreement, until the mortgage of $100,000 was reduced to $74,000, when, in the month of June, 1886, sales were stopped, and, there being no receipts, the interest which came due was not paid, at

which juncture the executors commenced the foreclosure of the mortgage. The foreclosure proceedings were allowed to come to a decree, execution and sale, at which the property realized over $79,000—a few hundred dollars over and above the costs and interest due. The purchaser was John B. Toner, who, it is admitted, was a clerk in the office of said Cohn, one of said corporators, and who bought, not for himself, but for Fitzpatrick, Newcombe and Cohn. Of this there is no doubt. The said James G. Fitzpatrick waited upon the master and arranged for the delivery of the deed, and, although the property was struck off to the said Toner, it was purchased for the said Fitzpatrick, Newcombe and Cohn.

The insistment of the bill is that this transfer of the title was inequitable, and was a scheme devised by the said Fitzpatrick, Newcombe and Cohn, for the purpose of procuring the title to the property in their own names, free from the rights and interests of the said devisees, and that therefore the transaction is fraudulent as to the said devisees, and should be set aside. It is insisted that, under the circumstances of this case, since they took the title, and that it still remains in them, they still hold the same in trust for the said heirs and devisees, precisely as they did before, and that they are liable in the law, under the direction of the court, to account therefor. It is further insisted that, being such trustees, they were not justified in becoming purchasers of the property which was committed to them in trust, to be disposed of by them in the manner in which this was committed to them. One of the prayers of the bill is that they may be restrained from conveying, or in any way encumbering the said lands; another prayer is that a receiver may be appointed to collect the rents and to control and manage said property.

The bill has been answered very fully. Very many of the principal allegations upon which the complainant relies for the maintenance of the injunction have been denied, and such denial quite clearly supported by affidavits. But, in my judgment, there is still enough in the case to justify the court in considering the propriety of retaining the injunction until final hearing. With this view, I will consider the case in the order in which it has

been so carefully and fully presented by counsel of the defendants.

*First.* It is said that this injunction should be dissolved, and the bill dismissed, because the executors of Maurice Raleigh have not been made parties. This position, I think, cannot be maintained. I cannot perceive that they have, at this time, any interest in this property. Their demands have all been satisfied and canceled. They have no right, in law or equity, to call upon any of the parties to this controversy for anything whatsoever. The mortgage, which, in their hands, was a valid lien, was not paid according to the terms thereof; and according to those terms they commenced the foreclosure of it, and made a sale, receiving thereby the amount due. All this was done in a lawful tribunal, in a lawful way, and upon notice to all persons interested. Every one who had an interest in the property, or any right to speak, had notice of what was being done, and had an opportunity to speak. If they had been made defendants, what charges could possibly have been presented against them which would not have been subject to exceptions, and to be overruled upon the plainest principles of equity? There is nothing anywhere which discloses any wrong-doing upon their part—anything that can be considered an impeachment of their duty as trustees under the will of Maurice Raleigh, deceased. How could they be made parties upon principle, unless they were asked to repay the money realized upon their mortgage by foreclosure, and to restore the mortgage to its former *status?* Taking into consideration what I have said, and their right to the money because of the non-payment of interest when due, the question is answered. Evidently, neither the corporation, nor any of the members thereof, nor any of the devisees or heirs, could require any such thing of the executors.

*Second.* It is said that, if the executors are not made parties, then Walter Raleigh, the complainant, must come into court with clean hands, and be ready to act equitably himself, and repay this money. I suppose a brief consideration of the facts which impelled the heirs and devisees of Maurice Raleigh, deceased, to commit their interests in their father's estate to this

company, will show the utter impossibility of Walter Raleigh, or any other one of the heirs or devisees raising the sum of $79,000. It is, perhaps, not out of the line of true reasoning upon such considerations to conclude that no one of them possessed any such ability financially. Had they been so fortunate, it would hardly have been necessary that they should have sought the aid and knowledge of trusted business men and capitalists to help them along in their enterprise. To ask Walter Raleigh to take this great burden upon himself would be like expecting a sunken Cunarder to be lifted by a tug, or Orion to carry Jupiter from his orbit. And if he is unfortunate enough to be unable to do that which the defendants insist would be equity, then is it a case which obliges the court to deny him all relief? I feel constrained to proceed further, and to inquire whether or not, since the relationship of these parties has only been changed so far as to give the security itself—that is, the land—to the debtor—that is, this land improvement company—whether or not equity does not demand that it shall still account, as it was originally obliged to account, and as it would have accounted, had land enough been sold to realize money sufficient to pay off and discharge the said mortgage. In other words, upon this motion to dissolve the injunction, I am not satisfied that it is my duty to hold that the complainant must raise and pay $79,000 to these members of this corporation or be turned out of court.

*Third.* It is said that, as the legal title to the property is vested in the three defendants, Fitzpatrick, Newcombe and Cohn, by reason of the foreclosure sale, the proper relief would be to declare the trust for which these parties hold this title, and not to enjoin them from selling it or otherwise disposing of it. According to this view of the counsel for the defendants, the injunction, though too broad, should not be entirely removed. Of course he does not mean to say by this that the injunction cannot properly stand at all, but that it should be so modified that they may be permitted to dispose of the property. This view is put upon the ground that the complainant's interest is in all about one-sixth of the four thousand shares; that is, about one-sixth of

what may be received from the trust property after the payment of the $79,000 and of all other liabilities to which the said property is subject under the agreements. In my judgment, if it be conceded that there is any foundation for this bill, and for the interposition of the court by injunction, the writ, as it has been already awarded, is not too broad. If Fitzpatrick, Newcombe and Cohn can be regarded as holding this property under the same trusts under which it was held before the foreclosure, and that their management of it was such as to justify the court in taking control of the future disposition of it, it would hardly be safe for the court to permit them, who had the principal management heretofore, to proceed to the sale and disposition of these lands before final hearing. The answer and affidavits thereto disclose such feeling as to make such a course highly injudicious and imprudent.

*Fourth.* It is said that none of the other heirs of Maurice Raleigh, deceased, and none of the defendants named in the bill, have asked for any such relief; that even should relief be granted, it should be confined to him, and not so shaped as to include the others who have not asked for such relief. Plainly, this is a matter of detail, and, if the injunction stands, can be provided for upon final hearing as plainly. If the complainant is right in thus asking the court to protect his interests, and, in order to effect such protection, an injunction should stand, there can be no sale of his interests separately so long as the foregoing agreements are held binding. And it seems to me equally plain that each is bound to the other, by virtue of their agreement, to such an extent that this trust cannot be accomplished without the sale of all their interests in this property, in parcels or otherwise, conveying their interests at the same time. I understand their agreement to be most explicit that neither one of them will sell or in anywise encumber any of their interests in this land. The purpose of this must have been to avoid everything like embarrassment in the sale of the property as a whole. To this method of disposition they each committed themselves, and the court cannot arbitrarily disregard it.

*Fifth.* It is said that no relief of any kind should be granted

Raleigh v. Fitzpatrick.

the complainant without his giving ample security to indemnify the defendants against loss by reason of any subsequent failure of the parties to realize the amount of money invested by the defendants in the property, and also to indemnify them for interest upon the money so invested. To require this could only be upon the presumption that he is in the wrong and that the defendants are in the right. If the court should act upon such presumption as this, in a case of this character—one of trust—the bill should be dismissed. The theory of the bill plainly is that a wrong has been committed by these defendants, and that the complainant is the sufferer. I cannot see any propriety, in such a case, in requiring him to give indemnity.

*Sixth.* It is said that the complainant is estopped from disputing the validity of the foreclosure sale, because he allowed it to be made without objection, saying nothing until after the defendants were bound by their bid, and also by afterwards accepting from the executors a payment of a portion of this money as income due him under the will of his father, without ever having attempted to impeach the sale in any way until after such payment. As already intimated, so far as the executors were concerned, that sale could not and cannot be attacked. Whatever was done by them was lawfully and completely done. I can see no possible method of overthrowing the decree which they obtained, or of in any way impeaching it. It is not the sale itself, as conducted by the executors, which it is sought to overthrow or impeach, but the complainant, Walter Raleigh, seeks, by this bill, to impeach the conduct of the members of this company who were entrusted with his rights and interests, in the use which they made of the opportunity given to the executors to sell to effect a transfer of the title of this property to themselves (the members of the company), that they might hold it for their individual benefit, and free from all obligations upon their part to Walter Raleigh. It was lawful for the executors to make such a sale, but the question remains, whether or not it was lawful for this land improvement company to permit such a sale to be made. The question remains, whether or not they did not have it in their power, by wise and prudent management of their trust, to pay the interest as it fell

Raleigh *v*. Fitzpatrick.

due from time to time upon the mortgage. The question remains, whether or not, besides paying the said interest, they did not have it in their power to make further reductions of the principal by such means as they had theretofore reduced the principal from $100,000 to $74,000. The question remains, whether or not, under the circumstances, they were justified in not, by some lawful means, effecting a sale of this property in parcels, themselves, in order to prevent the foreclosure and the sale of the whole of it in bulk, when the step taken by them, as well as by their *cestui que trust*, makes it most manifest that the great purpose in view, in forming the said company, was the improvement of these lands and the sale of them in parcels.

*Seventh.* It is said that, under the agreements above recited, all the stock of Maurice Raleigh was subject, in the first instance, to the payment to the executors of the balance due upon the mortgage, and if the executors had purchased the property at their bid at $78,000, they would not hold it for the benefit of the complainant and the other legatees and devisees under the will, and, in such an event, it is said the present suit could not be maintained. The argument is, that if, in such an event, a suit could not be maintained, this suit certainly cannot be maintained. This line of reasoning, it seems to me, is upon the same false premise. It is an assumption that the action of the executors in such case would have necessarily been, in the eye of the law, fraudulent. Such does not appear ; and without such fraudulent conduct appearing, their strict legal rights certainly must be protected. Until it is shown that they availed themselves of the form of law for the purpose of acquiring an unfair profit of the defendants, either in their own behalf or in the behalf of others, the rights which they would have acquired could not be disturbed. But I have not that question to decide.

*Eighth.* It is said that the fraudulent and negligent acts charged against the defendants, as directors of the said company and otherwise, are fully answered by the defendants, and are not contradicted in any way by any testimony in addition to that of the complainant. As already intimated, if this were to be conceded, it would not follow that the injunction should be dissolved at

33

this stage. Numerous illustrations might be given, where trustees could answer such charges either by a positive denial, or by a statement of the facts, and yet render themselves liable in equity to the just claims and demands of his *cestui que trust,* which claims and demands the court might feel itself bound to enforce against specific property by retaining the property intact and under its control, for the purpose of effecting the design of the parties who declared the trust. And thus far, it will be perceived, I have proceeded upon the idea that the defendants, or some of them, were entrusted with the rights and interests of the Raleigh heirs and devisees, and that as such they were under the highest obligations to such heirs and devisees. They were selected as such trustees because they were men of ability, character and financial standing. And, it will be noted, they protected themselves to the utmost limit.

*Ninth.* It is said that the defendants have, heretofore, offered to buy complainant's stock, or to sell theirs to him; that before the foreclosure sale, they offered to sell their interests for ninety per cent. of the cash money they had put therein, without interest; that the complainant claims that the property is worth four times the amount of the $150,000 purchase price, and yet he has refused this offer; and that they have offered, since the foreclosure sale, to convey to the complainant and any persons who were willing to act with him, their interest in the property at the same terms, in addition to the repayment of the money they have been compelled to expend in the foreclosure sale; that they have also offered, if the chancellor deem proper, that there should be a resale of the property, if the complainant will give a sufficient bond, so that the interests of the executors and other parties shall be protected, in case of the property being purchased by other parties than these defendants at a lower price than $79,000. All of these propositions, it is said, have been refused by the complainant, and that he still insists on having the beneficial use of the $79,000, and to escape from his covenants by the agreement of October 1st, 1884, and to have the same benefit in every way as though he had done what he agreed to do. However fair this offer of purchase or sale may appear upon

the part of the defendants, it seems to be unquestionably clear that Walter Raleigh was in no sense, in law or equity, bound to accept either of them. They offered to sell to him for ninety per cent. of the money which they had invested. They had invested the $50,000 which had been advanced, and which was represented by two thousand shares of stock, to pay the executors at the time of the original transaction; they wanted ninety per cent. of this from Walter Raleigh. They had paid $79,000, the purchase price at the foreclosure sale; they wanted ninety per cent. of this from Walter Raleigh. When the condition of the Raleigh estate, as disclosed by these agreements, is looked into, and it is considered that it was deemed expedient by all parties that those agreements should be made, it will not be difficult to understand that it was impossible for Walter Raleigh to raise the amount of money required to meet the proposition of these defendants. And it seems to me that the next proposition contained in this objection is alike without sure support. If Walter Raleigh could not be expected under the circumstances to purchase according to the demands of the defendants, it would seem to me to be quite as difficult for him to give bonds; for who can tell, as every prudent business man would say, what the loss from litigation and delay respecting such a matter would entail. Besides this, much of the objection is answered by what has been said already. It implies an obligation upon the part of Walter Raleigh to do something to protect the interests of those whom he charges to be guilty of wrong doing. It seems to me that if, in this case, he has rights which the court is bound to respect and protect, as against these defendants, they being trustees, he has the right to call them to account and to hold them to that responsibility or accountability which the law imposes, without any assurance of indemnity or reward from him.

*Tenth.* It is said that Walter Raleigh has a claim as a stockholder to the extent of $2,500, and that in respect to this $2,500, he has brought a suit at law against Mr. Fitzpatrick in the city of Philadelphia, on account of which suit he is not entitled to any standing in this court. It is said that he alleges in that suit that his stock is not valid, and has offered to return the certifi-

cate, and that such suit is now pending. If this objection were valid in part, it seems to me that it is not in the whole, because, as I understand it, it does not extend to the whole case; the whole issue raised by the bill is not thereby disposed of. If, because thereof, an equity should arise, and this case go to a final hearing, there would be no trouble whatsoever in disposing of the rights of the parties according to their equitable interests. *Gardner* v. *Raisbeck, 1 Stew. Eq. 71; Longstreet* v. *Phile, 10 Vr. 63; Dawley* v. *Brown, 79 N. Y. 390, 397.*

The eleventh and twelfth objections, it seems to me, have virtually been disposed of already; they being but amplifications of former propositions.

Now, it seems to me that the full value or force of the objections presented by the defendants to the continuance of this injunction will be best understood by considering what this company and these, its directors and agents, undertook to do, and what obligations devolved upon them from such undertaking. These thirty thousand acres of land, as a whole, it was conceived by them, were of comparatively little value. They all believed that by a proper division of them into parcels, and by prudently managing the sales of them, so divided, they could realize a very much larger price than by selling them as a whole. To accomplish this the company was formed. Not only did the devisees and heirs-at-law of Maurice Raleigh believe that the property was of much greater value, when so divided, than it was estimated to be worth as a whole, but Fitzpatrick, Newcombe and the other members of the said corporation must have so believed also. It will scarcely be pressed by them, in any event, that this scheme was undertaken with the full conviction that the $600,-000 worth of stock on paper, was in no event worth over $150,-000. They do not come into court and stultify themselves by saying that, at the time the company was formed, it was a scheme to deceive and delude the unsuspecting. I shall, therefore, proceed upon the conviction that, when these parties entered into this arrangement for the benefit of this family, they had an honest belief that, by the prosecution of the plan, large sums of money would be realized over and above the amount of money

Raleigh v. Fitzpatrick.

actually invested, to wit, the $150,000.  It might be added, by way of confirmation of this, that there is nothing in the relation of Newcombe or Cohn with the Raleigh family to induce them to give their time and money, and to run the risk of such an undertaking, for nothing.  Nor is this method of reasoning rendered futile by the allegation that these lands in reality were not, and are not, worth over $150,000, and that there is in truth and in fact no equity in them at this time for the said heirs and devisees.  The reasoning in behalf of the complainant proceeds, as has been said, upon the conviction that all the parties interested in these lands originally, as well as those who came in afterwards and participated, proceeded, after due deliberation, upon the theory that by pledging themselves each to the other, and uniting in their efforts to that end, they could make disposition of these lands to a profit greatly in excess of the $150,000, by offering them for sale in parcels.  And that is what this company and these trustees undertook to do, and the measure of that undertaking is the measure of their responsibility.

Did they accomplish the purpose thus assigned them, and thus by them agreed upon·?  And if they did not, why not?  And if not, then is the reason assigned sufficient to release them from all further obligation ?  Clear enough it is, from every statement of the bill and answer, that they did not accomplish what they undertook.  They sold but a comparatively small proportion of these lands.  They realized from what they did sell enough to reduce the mortgage held by the executors from $100,000 to $74,000.  They had remaining one parcel, with improvements thereon, for which they were offered $20,000.  That this was a fair price, I think is conceded.  As the case stands before me, from the character of the undertaking, the progress made during most of the time was reasonably rapid.  They had it in their power to sell all of this land ; *that* is the trust that was consigned to them.  The parties had agreed, each with the other, that they would not in any wise sell or encumber their respective interests in the land.  All had been pledged to a common purpose.  That it was worth the amount of the mortgage, as a whole, has been

proved by the success of the executors in realizing the amount due thereon when sold in the lump.

Now, why was this unfortunate failure of the enterprise? Why were they unable to realize more than the $150,000 for this land? The defendants now say that the land is not worth more than it sold for at the foreclosure sale. They say, also, that Walter Raleigh became so offensive to Fitzpatrick, and, by his manner and methods, so obstructive, that the work of making sales could not be proceeded with. It is said that he not only was thus offensive and obstructive to Fitzpatrick, but that he studiously circulated abroad, so that it reached the ears of those who would be purchasers, his objections to proceeding with these sales, and his threats to interfere with the action of the company, and that this he carried so far as to frighten away bidders.

In looking at this phase of the question, it must be remembered that Walter Raleigh was interested in these lands, and was a member of this company, and that in both aspects he was entitled to consideration and had a right to speak. Therefore, giving the objection full force, it does not satisfactorily appear to me that the company had any just cause for suspending sales altogether, or to such an extent as to be unable to meet the demands upon them by the accruing interest on this mortgage. As I have said, Walter Raleigh was also one of them, and it is very difficult to induce the belief that he could make intelligent persons believe that this company had no power to act, that they could not convey a good title, or that he could prevent their acting, or could prevent their conveying a good title, after he had himself, as their secretary and as their agent, effected numerous sales of portions of this same property. It rather seems to me that they hesitated in the performance of their duty after he became offensive in his manner to Fitzpatrick, resolving to cast the consequences of their hesitation upon him, and to reap the benefits which would flow from a sale under the foreclosure themselves, and would thereby oust him from any title to the property or interest therein. And it has resulted thus—the court will be justified in staying the hands of the defendants until further inquiry is made on this point.

Raleigh v. Fitzpatrick.

It seems to me that the facts presented, and the consideration given to the case, justify a reference to the case of *Carson* v. *Marshall, 10 Stew. Eq. 213,* affirmed on appeal, *11 Stew. Eq. 250,* and not only warrant my relying on that case, but require me to be governed by it, in the determination of the question presented at this time. The court of errors and appeals said : " So jealous is the law upon this point that a trustee may not put himself in a position in which to be honest must be a strain upon him. I think, upon correct principle, a trustee, in no case nor in any crisis, can become the purchaser of property when the fact of his making such purchase has a tendency to promote his own interest at the expense of his *cestui que trust.* What possible difference can it make, in reason and principle, in what manner, or by whom the sale is made of that which the trustee holds, when his duty in his trust relations is to make the property bring the highest price, in the protection of the interests of the *cestui que trust?* His duty remains the same; he stands concerned, for the time being, as would be the owner of the property in appreciating it. When he becomes the purchaser, and exercises the conceded privilege of a purchaser to acquire at the lowest price, a direct conflict between fiduciary and personal interests arises. This, as I understand the rule, is the test of the validity of such a purchaser, and not the indifferent circumstance that the sale is under the conduct of himself or another."

This explicit declaration of the law makes it apparent that a trustee cannot himself be the purchaser of property which has been committed to him to sell, whether he sells that property himself, under the trust, or whether it is sold by somebody else, under the forms of law. And it seems to me that the value of this principle of law was never more strongly illustrated and enforced than in the case now under consideration. Supposing these gentlemen to have engaged in this work with the most honest intention to prosecute it with diligence, and to effectuate the very highest interests of the *cestui que trust,* and to have proceeded in the work until the differences between Walter Raleigh and Fitzpatrick gave them an excuse for becoming lukewarm, or indifferent, or hostile, or to determine that they would take

Raleigh v. Fitzpatrick.

advantage of his misconduct and the crisis which would inevitably arise if they held their hands, to wit, the maturity of the mortgage by the non-payment of interest, a foreclosure, a sale, and a purchase by them, and thereby acquisition of an estate in fee simple, free from all obligations in this whole tract of land—they certainly could not proceed, and make such purchase, without being subject to the severest criticisms of the indifferent business man. or judge. This fault-finding of Walter Raleigh these trustees exhibit as an excuse for the total neglect of this property, and for making no sales whatever; they exhibit it as an excuse for allowing the foreclosure proceedings to be carried to completion, and for a sale of the property thereunder in bulk. This, it seems to me, they were not, under any circumstances, justified in doing. Did Walter Raleigh misbehave? Was his manner and conduct offensive and obstructive? Did he discourage bidders, and slander the title to this property, and create such doubts that persons having the means, and being interested, would refuse to invest, though they otherwise desired to do so? If so, now by the very proceedings which it seems to me these trustees connived at, and by their indifference encouraged, they had an opportunity to set at defiance the conduct of Walter Raleigh, and to overcome every objection which he had made or possibly could make, and to secure to purchasers, who were interested, a perfectly indisputable title in fee simple to any and every parcel of these lands. Now, they had a chance, if not so certainly effective and advantageous to the heirs and devisees of Maurice Raleigh, deceased, yet an effectual chance of carrying out the design which they encouraged those heirs and devisees to enter into when they agreed to accept of the proposition to form the said company, and to divide the said land in parcels, and sell it in such parcels. They now had it in their power to ask the court of chancery to direct the master to make sales of these lands in parcels. The court always invites such applications, and always responds favorably thereto, even when it may be said to be reasonably questionable whether any profit will arise therefrom or not to those who are beneficially concerned. But this opportunity, so apparent upon the face of it, and in the

Raleigh v. Fitzpatrick.

acceptance of which they would have been so amply justified, they neglected, and allowed the property to be sold in bulk, with what may be said, in reason, the certainty before them that but few persons would be found ready and willing to pay enough, as a whole, to cover the amount of the encumbrance, over $78,000. In this situation, these trustees, accepting the excuse as sufficient that Walter Raleigh had become hostile and obstructive, thus allowed this sale to proceed at the instance of the executors, when the duty was fairly imposed upon them of making sale thereof themselves. That duty was imposed by their voluntarily accepting the trust, creating the very interest, on the one hand, and imposing a duty on the other, which are contemplated by the learned justice in the language which I have quoted from his opinion in *Marshall* v. *Carson, ubi supra.*

In the Carson case, the testator had directed his executors to sell his lands for the payment of his debts. Judgments were obtained against him. Afterwards, instead of selling the lands themselves, to discharge these judgments and other obligations, the executors allowed the sheriff to proceed to make sales of the lands of the testator upon these judgments. The executors became the purchasers, and after such purchase, they claimed the right to hold the lands in fee simple, discharged of any trust. It was resolved that this they could not do. In the case before me, this company undertook to make sale of these lands, and they expressly agreed to do so, and to discharge, out of the proceeds of said sales, this mortgage. They did not sell lands enough for that purpose. They allowed the condition by which the mortgage became due to arise, when a sale was made under the forms of law by the master, the trustees themselves becoming the purchaser. Clearly this case is so like the other, that I would be derelict in duty if I did not accept that as my guide.

And what I have said, which leads me to conclude that the injunction should continue, also leads me to conclude that a receiver should be appointed to take charge of this property, and effect a sale according to the terms and stipulations of the foregoing agreements. I have sought to satisfy my mind that I could, according to my first desire, follow *City Pottery Co.* v. *Yates,*

*10 Stew. Eq. 543,* and continue the management of these lands and this trust in the hands of the original corporators, but the answer and the affidavits disclose so great an alienation of feeling, that I have been compelled to reject that view.   I think, under the circumstances, every consideration requires the appointment of a stranger.   Of course all of the rights and interests of the defendants will be protected and secured as far as the rents and proceeds will extend.   The costs will abide the final issue.